# IN THE SUPREME COURT OF IOWA

No. 16–1732

Filed April 13, 2018

**IN RE THE DETENTION OF NICHOLAS WYGLE,**

**NICHOLAS WYGLE,**

Appellant.

Appeal from the Iowa District Court for Butler County, DeDra Schroeder, Judge.

A person subject to commitment under the Sexually Violent Predator Act requests interlocutory review of the denial of his motion to dismiss the civil commitment proceedings. **REVERSED AND REMANDED WITH DIRECTIONS.**

Michael H. Adams, Chief Public Defender, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller and Keisha F. Cretsinger, Assistant Attorneys General, for appellee.

**APPEL, Justice.**

In this case, Nicholas Wygle appeals a district court's denial of his motion to dismiss the State's petition for his civil commitment as a sexually violent predator (SVP) under Iowa Code chapter 229A (2016). Wygle had been previously convicted of assault with intent to commit sexual abuse. At the time the State initiated the civil commitment proceedings, Wygle had discharged his sentence for his underlying sexual offense but was residing at the Curt Forbes Residential Facility while serving a special sentence under Iowa Code chapter 903B.

The State makes no claim that Wygle committed a recent overt act, a requirement required for civil commitment under Iowa Code chapter 229A.4(2). The sole issue in this case is whether Wygle, by virtue of his residency at Curt Forbes Residential Facility pursuant to Iowa Code chapter 903B, is "presently confined" under Iowa Code section 229A.4(1) and thus qualifies for SVP commitment under this section of the statute.

For the reasons expressed below, we conclude that Wygle is not "presently confined" under Iowa Code section 229A.4(1), and as a result, the State cannot commence an SVP proceeding in the absence of a recent overt act, as required under Iowa Code section 229A.4(2). We therefore reverse the decision of the district court and remand the case with directions to dismiss the complaint.

## I. Factual Background and Proceedings.

In July 2012, Wygle was convicted of assault with intent to commit sexual abuse. The district court sentenced Wygle to serve an indeterminate term of incarceration not to exceed two years. In addition, the district court sentenced Wygle to serve a ten-year special sentence pursuant to Iowa Code chapter 903B. On August 7, 2015, Wygle was released from prison after having discharged his sentence on the assault

with intent to commit sexual abuse charge. Wygle remained, however, subject to the ten-year special sentence under Iowa Code section 903B. Upon his release from prison, Wygle boarded a commercial bus and travelled to a residential facility in Marshalltown. From there, he transferred to the Curt Forbes Residential Facility in Ames.

On March 14, 2016, the State filed a petition to have Wygle civilly committed as a sexually violent predator under Iowa Code chapter 229A. At the time the petition was filed, Wygle was residing at the Curt Forbes Residential Facility. The district court found probable cause pursuant to Iowa Code section 229A.5(2) and ordered a trial.

On August 30, Wygle filed a motion to dismiss because he was no longer "presently confined" under Iowa Code chapter 229A.4(1) and the State had not alleged a recent overt act that might otherwise support a section 229A.4(2) proceeding. The district court denied the motion.

Wygle filed an application for interlocutory appeal which we granted. For the reasons expressed below, we conclude the district court erred in not dismissing the petition.

**II. Standard of Review.**

This case involves a question of statutory interpretation. Review is for errors at law. *In re Det. of Geltz*, 840 N.W.2d 273, 275 (Iowa 2013).

**III. Discussion.**

**A. Introduction.** Iowa Code chapter 229A governs petitions for commitment of sexually violent predators. Iowa Code section 229A.4 "plots two separate courses" of civil commitment. *In re Det. of Shaffer*, 769 N.W.2d 169, 173 (Iowa 2009). First, the state may file a petition when the person is "presently confined" for a sexually violent offense. Iowa Code § 229A.4(1). Second, the state may file a petition when a person has committed a recent overt act under certain circumstances.

Iowa Code § 229A.4(2); *see In re Det. of Gonzales*, 658 N.W.2d 102, 104–05 (Iowa 2003) (stating that the "confinement" referenced in the statute "means confinement for a sexually violent offense").

The sole issue in this case is whether under the facts and circumstances Wygle was "presently confined" under Iowa Code section 229A.4(1). As we have recently noted, although due process generally requires a recent overt act to support the drastic depravation of liberty that results from a civil commitment, it is not necessary for the state to allege a recent overt act under this section. *In re Det. of Stenzel*, 827 N.W.2d 690, 693 (Iowa 2013).

**B. Constitutional Context of Overt-Act Requirement for Civil Confinement Based on Dangerousness.** Preventive detention is very limited in American law because it is seen as antithetical to fundamental liberty interests and the presumption of innocence. As Justice Jackson noted over half a century ago in *Williamson v. United States*, "Imprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this country and so fraught with danger of excesses and injustice that I am loath to resort to it . . . ." 184 F.2d 280, 282 (2d Cir. 1950).

Further, our legal tradition has emphasized that involuntary civil commitment is a "massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 1052 (1972), and a "grievous loss," *Vitek v. Jones*, 445 U.S. 480, 488, 100 S. Ct. 1254, 1261 (1980). As Justice Kennedy has observed, "[I]ncarceration of persons is . . . one of the most feared instruments of state oppression and . . . freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments." *Foucha v. Louisiana*, 504 U.S. 71, 90, 112 S. Ct. 1780, 1791 (1992) (Kennedy, J., dissenting). In addition to the

dramatic deprivation of liberty, cases have noted the social stigmatization that arises from involuntary commitment. *See Addington v. Texas*, 441 U.S. 418, 425–26, 99 S. Ct. 1804, 1809 (1979); *Stamus v. Leonhardt*, 414 F. Supp. 439, 449 (S.D. Iowa 1976); *Godwin v. State*, 593 So. 2d 211, 214 (Fla. 1992); *In re Det. of Harris*, 654 P.2d 109, 111 (Wash. 1982) (en banc).

"Courts have traditionally been the protector of individual rights against state power . . . ." David L. Bazelon, *Institutionalization, Deinstitutionalization and the Adversary Process*, 75 Colum. L. Rev. 897, 910 (1975). Given the truly weighty interests at stake, the power of the state to involuntarily commit individuals is subject to due process protections. The United States Supreme Court has repeatedly held that the Due Process Clause of the United States Constitution contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986)); *see* James W. Ellis, *Limits on the State's Power to Confine "Dangerous" Persons: Constitutional Implications of* Foucha v. Louisiana, 15 U. Puget Sound L. Rev. 635, 644–45 (1992).

In order to narrowly limit the scope of involuntary civil commitments to situations involving nonspeculative danger and satisfy the demands of due process, many courts in the past have required the state to show an overt act, attempt, or threat. For instance, in *Stamus*, the federal district court held that the lack of an overt-act requirement was a factor in finding an Iowa involuntary hospitalization statute unconstitutional on due process grounds. 414 F. Supp. at 450–51; *see also Suzuki v. Yuen*, 617 F.2d 173, 178 (9th Cir. 1980); *Doremus v.*

*Farrell*, 407 F. Supp. 509, 514–15 (D. Neb. 1975); *Lynch v. Baxley*, 386 F. Supp. 378, 391 (M.D. Ala. 1974). The rationale for an overt-act requirement is that the present "dangerousness" required for civil commitment is an amorphous concept that must be supported by some concrete, individualized evidentiary showing to prevent arbitrary confinement. *See In re Kochner*, 662 N.W.2d 195, 202 (Neb. 2003) ("The recent violent act requirement is meant as a safeguard to ensure that the liberty of the subject is not unjustly restrained."); *see also* Reed Groethe, *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Civil Commitment of the Mentally Ill*, 44 U. Chi. L. Rev. 562, 574–79 (1977).

Beginning in the 1990s, states began to enact SVP-type statutes. *See* John Q. La Fond, *The Costs of Enacting a Sexual Predator Law*, 4 Psychol. Pub. Pol'y & L. 468, 474 (1998). Unlike the usual general civil commitment statutes, the new SVP statutes often did not require that an individual have a "mental illness," but only a "mental abnormality." *See* Kaitlyn Walsh, Note, *Antisocial Personality Disorder and* Donald DD*.: Distinguishing the Sex Offender from the Typical Recidivist in the Civil Commitment of Sex Offenders*, 44 Fordham Urb. L.J. 867, 884 (2017). Further, the statutes required the state to show various formulations of dangerousness in order to commit an individual as a sexually violent predator. *See* Deirdre M. Smith, *Dangerous Diagnosis, Risky Assumptions, and the Failed Experiment of "Sexually Violent Predator" Commitment*, 67 Okla. L. Rev. 619, 661 (2015) [hereinafter Smith].

SVP statutes were attacked as arbitrary on several grounds. First, many critics found the concepts of mental abnormality or mental disorder to be "so vague and broad that it excludes almost no one." Eric S. Janus, *Closing Pandora's Box: Sexual Predators and the Politics of*

*Sexual Violence*, 34 Seton Hall L. Rev. 1233, 1237 (2004) [hereinafter Janus]; *see, e.g.*, Grant H. Morris, *The Evil That Men Do: Perverting Justice to Punish Perverts*, 2000 U. Ill. L. Rev. 1199, 1206–07 (2000); Stephen J. Morse, *Fear of Danger, Flight from Culpability*, 4 Psychol. Pub. Pol'y & L. 250, 265 (1998).

Second, the ability to link the mental abnormality with future behavior is fraught with difficulty. *See* Smith, 67 Okla. L. Rev. at 674–76 (describing absence of strong correlation between diagnosis of a pedophilia or paraphilia with acts of sexual violence).

Third, and more generally, predicting future behavior is said to be extremely difficult. Melissa Hamilton, *Public Safety, Individual Liberty, and Suspect Science: Future Dangerousness Assessments and Sex Offender Laws*, 83 Temp. L. Rev. 697, 726–31 (2011) [hereinafter Hamilton, *Public Safety*] (describing the scientific problems with several actuarial assessment models, noting that a meta-analyses of studies at best show actuarial models to be less than "moderately predictive"); Lisa Kavanaugh, Note, *Massachusetts's Sexually Dangerous Persons Legislation: Can Juries Make a Bad Law Better?*, 35 Harv. C.R.-C.L. L. Rev. 509, 512 (2000) ("Most mental health professionals agree, however, that advances in actuarial techniques have not yet significantly improved their ability to predict long-term future dangerousness, which is the centerpiece of most civil commitment schemes."); Smith, 67 Okla. L. Rev. at 675 ("Psychiatrists have long rejected the notion that they have a special ability to predict future behavior, particularly dangerous conduct."). It has been claimed, for instance, that the predictions of experts are little better than chance. *See* Smith, 67 Okla. L. Rev. at 700 (citing Rebecca L. Jackson et al., *The Adequacy and Accuracy of Sexually Violent Predator Evaluations: Contextualized Risk Assessment in Clinical*

*Practice,* 3 Int'l J. Forensic Mental Health 115, 124 (2004)); *see also* Erica Beecher-Monas & Edgar Garcia-Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post*-Daubert *World,* 24 Cardozo L. Rev. 1845, 1860 (2003).

In recent years, there has been a trend in SVP cases away from expert testimony based on clinical judgment in favor of expert testimony based, at least in large part, upon an assessment of actuarial risk. *See* Marcus T. Boccaccini et al., *Field Validity of the STATIC-99 and MNSOST-R Among Sex Offenders Evaluated for Civil Commitment as Sexually Violent Predators,* 15 Psychol. Pub. Pol'y & L. 278, 278–79 (2009). These new tools, however, have been subject to substantial criticism. For example, the STATIC-99 is based on a relatively small baseline statistical sample of a little over 1000 offenders from Canada and England who were released from maximum security or mental health facilities. *Id.* at 280; Leslie Helmus et al., *Reporting Static-99 in Light of New Research on Recidivism Norms* 1 (2009), http://www.static99.org/pdfdocs/forum_arti cle_feb2009.pdf. Critics have charged that the lack of a representative baseline for comparison of American offenders released from a variety of settings or who simply engaged in a recent overt act is problematic. *See* Hamilton, *Public Safety,* 83 Temp. L. Rev. at 730 ("If the second population differs in any risk-relevant way from the reference group, then the predictive result is invalid."); *see also* John A. Fennell, *Punishment by Another Name: The Inherent Overreaching in Sexually Dangerous Person Commitments,* 35 New Eng. J. on Crim. & Civ. Confinement 37, 59 (2009) [hereinafter Fennell] (finding baseline of STATIC-99 nonrepresentative because, among other things, the rate of sexual assault in Canada is more than twice that of the United States and concluding models overstate risk).

Further, even taking the STATIC-99 at face value, there are many false negatives and positives. Critics point out that the error rate for the STATIC-99 is much higher than that ordinarily associated with risk prediction research. Hamilton, *Public Safety*, 83 Temp. L. Rev. at 727. In addition, critics note that the correlation coefficient—a metric showing the strength of the correlation between two variables—for the STATIC-99 is very low and even for high risk offenders the STATIC-99's performance is "not much better than a coin flip." Fred S. Berlin et al., *The Use of Actuarials at Civil Commitment Hearings to Predict the Likelihood of Future Sexual Violence* 4, 6 (2003), https://www.researchgate.net/publication/9043223_The_Use_of_Actuarials_at_Civil_Commitment_Hearings_to_Predict_the_Likelihood_of_Future_Sexual_Violence.[1] According to Judge Richard Posner, even advocates of the STATIC-99 only claim moderate predictive accuracy, and that while the actuarial approach "may be more accurate than clinical assessments, . . . that may not be saying much." *United States v. McIlrath*, 512 F.3d 421, 425 (7th Cir. 2008); *see* Hamilton, *Public Safety*, 83 Temp. L. Rev. at 739.

Finally, the lack of meaningful treatment and the potential of long-term confinement without an end in sight has also drawn criticism. According to one commentator, "it is far better to be punished than to be

---

[1]The body of literature questioning actuarial assessments of SVPs is substantial. For a representative view, see Jessica M. Eaglin, *Constructing Recidivism Risk*, 67 Emory L.J. 59, 122 (2017) ("More caution and nuance is necessary in approaching the use of recidivism risk tools in the administration of criminal justice."); Fennell, 15 New Eng. J. on Crim. & Civ. Confinement at 61 (stating laws relying on actuarial tools ask science to "perform a task it cannot reliably perform"); Melissa Hamilton, *Adventures in Risk: Predicting Violent and Sexual Recidivism in Sentencing Law*, 47 Ariz. St. L.J. 1, 61 (2015) ("To the extent that sentencing includes utilitarian concerns involving future risk, science cannot save the legal system from a heavy measure of uncertainty."); and Hamilton, *Public Safety*, 83 Temp. L. Rev. at 754 (supporting a ban on use of actuarial tools because of significant problems and lack of legal criteria to guide their use).

treated." Jeremiah W. White, Note, *Is Iowa's Sexual Predator Statute "Civil"? The Civil Commitment of Sexually Violent Predators After* Kansas v. Crane, 89 Iowa L. Rev. 739, 774 (2004) (quoting Fred Cohen, *The Law and Sexually Violent Predators—Through the* Hendricks *Looking Glass, in The Sexual Predator: Law, Policy, Evaluation and Treatment* 1–5 (1999)).

Largely for the above reasons, the American Psychiatric Association (APA) and the American Bar Association (ABA) have opposed SVP statutes. The APA has strongly opposed enactment of SVP statutes because of the role assigned to psychiatric expertise to identify those who should be committed. In an amicus brief before the United States Supreme Court in *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072 (1997), the APA challenged the breadth of SVP statutes, stated that mental health professionals lack the ability to predict future violence with accuracy, argued the term "mental abnormality" is a circular concept when defined as a pattern of abnormal acts, and stated that current treatments for SVPs have so little chance of being effective that confinement under an SVP statute is effectively permanent. Brief for American Psychiatric Association as Amicus Curiae Supporting Respondent, *Hendricks*, 521 U.S. 346, 117 S. Ct. 2072 (Nos. 95–1649, 95–9075), 1996 WL 469200, at *18–19, 24, 28–29.

Similarly, in *Barefoot v. Estelle*, 463 U.S. 880, 103 S. Ct. 3383 (1983), the APA filed an amicus brief questioning the value of expert testimony predicting future behavior in a death penalty case. Brief for American Psychiatric Association as Amicus Curiae Supporting Petitioner, *Barefoot*, 463 U.S. 880, 103 S. Ct. 3383 (No. 82-6080), at *4. As recounted in Justice Blackman's dissent, according to the APA, approximately two out of three predictions by psychiatrists of long-term future dangerousness were erroneous. *Barefoot*, 463 U.S. at 920, 103

S. Ct. at 3408 (Blackmun, J., dissenting). Justice Blackmun wondered how juries could separate valid from invalid expert opinions "when the 'experts' themselves are so obviously unable to do so." *Id.* at 929, 103 S. Ct. at 3413.

The ABA opposed SVP statutes in its Criminal Justice Mental Health Standards. Specifically, standard 7-10.7 provides that once a sentence has expired, commitment may occur only under a general commitment statute and calls for repeal of all statutes that provide for postsentence commitment of offenders using criteria that differ from the general civil commitment criterial. Christopher Slobogin, *The American Bar Association's Criminal Justice Mental Health Standards: Revisions for the Twenty-First Century*, 44 Hastings Const. L.Q. 1, 16 (2016); *see also In re Blodgett*, 510 N.W.2d 910, 920 n.5 (Minn. 1994) (noting that the ABA had urged that sexual psychopath laws be repealed due to problems with the ability of psychiatrists to diagnosis and treat such individuals).

Given the interests at stake and the problems implementing SVP statutes, it is not surprising that the Kansas Supreme Court and a federal district court came to the conclusion that SVP statutes did not pass constitutional muster. *In re Care & Treatment of Hendricks*, 912 P.2d 129, 138 (Kan. 1996), *rev'd sub nom. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072; *Young v. Weston*, 898 F. Supp. 744, 751 (W.D. Wash. 1995). In *Young*, the Washington State Psychiatric Association submitted an amicus brief arguing that the notion of a "sexually violent predator" is not a medical concept but an "unacceptable tautology." 898 F. Supp. at 750.

Notwithstanding the opposing of the APA and ABA, the United States Supreme Court, by a 5–4 margin, upheld the Kansas SVP statute in *Hendricks*, 521 U.S. 346, 117 S. Ct. 2072. Justice Thomas concluded

that the term "mental abnormality" was sufficiently narrow to satisfy due process even though it did not amount to a mental illness as previously required for civil commitment in the Court's precedents *Addington* and *Foucha*. *Hendricks*, 521 U.S. at 358–60, 117 S. Ct. at 2080–81; *see id.* at 374, 117 S. Ct. at 2088 (Breyer, J., dissenting). In a cautionary and arguably prescient concurring opinion, however, Justice Kennedy emphasized that if the term "mental abnormality" proved to be too imprecise, the precedents of the Court "would not suffice to validate it." *Id.* at 373, 117 S. Ct. at 2087 (Kennedy, J., concurring).

The United States Supreme Court again considered a challenge to the Kansas SVP statute in *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867 (2002). In an opinion by Justice Breyer, the Supreme Court emphasized that SVP statutes must distinguish between "the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment, and the dangerous but typical recidivist convicted in an ordinary criminal case." *Id.* at 413, 122 S. Ct. at 870. As in *Hendricks*, the Supreme Court emphasized the need to identify a narrow class of persons subject to SVP commitment. *See id. Crane* seems to assume that it would be possible for a fact finder to meaningfully distinguish a true predator from an ordinary recidivist.

Some might conclude that if a high authority declares a statute to be narrow often enough, it must be so. But there is reason to believe that because of the amorphous standards and community fear, fact finders are not able to identify a narrow class of persons subject to SVP commitment. The numbers of persons committed have grown far larger than anticipated. Janus, 34 Seton Hall L. Rev. at 1251. In practice, much as Justice Kennedy cautioned, the narrow legal stiletto may be something of a blunderbuss.

As a result, and notwithstanding *Hendricks* and *Crane,* the overt-act requirement still has a role to play in considering the constitutionality of SVP statutes. The overt-act requirement serves as a reinforcing mechanism or a spine for the spongy concept of "mental abnormality" and the speculative nature of causation in any individual case. The overt-act requirement, though not necessarily perfect, certainly has a winnowing effect and contributes to distinguishing a sexual predator from an ordinary recidivist. If not for a clear showing of current dangerousness by an overt act, SVP commitment would look a lot more like punishment and a lot less like civil commitment, thereby giving rise to double jeopardy and ex post facto difficulties. The narrow class of persons subject to SVP commitment should not be identified in a speculative numbers game. It must be based on proof of individualized danger.

The Washington Supreme Court held in *In re Personal Restraint of Young* that the recent overt-act requirement is generally mandated by due process because the state must show current dangerousness. 857 P.2d 989, 1008 (1993) (en banc), *superseded by statute on other grounds,* Wash. Rev. Code Ann. §§ 71.09.020, .090–.098 (West), *as recognized in In re Det. of Thorell,* 72 P.3d 708, 720–21 (2003) (en banc). The *Young* court has further held that when an individual is incarcerated for violation of their release into community placement, due process requires the state allege and prove a recent overt act. *Id.* at 1009; *see also In re Det. Albrecht,* 51 P.3d 73, 78 (Wash. 2002) (en banc).

While a recent overt act is generally required in Washington, there is an exception for situations where the offender is presently incarcerated for sex crimes. *Young,* 857 P.2d at 1009. The rationale for this approach was outlined in *People v. Martin,* 165 Cal. Rptr. 773, 780 (Ct. App. 1980).

In *Martin*, a California appellate court observed that the state was not required to prove the absurd, namely, that a recent overt act occurred, when the offender had been incarcerated. *Id.*

But as noted in a concurring opinion in *In re Detention of Fair*, the absurdity of requiring a recent overt act can be overstated. 219 P.3d 89, 96–97 (Wash. 2009) (en banc) (Fairhurst, J., concurring). In *Fair*, an individual was convicted of sex crimes against children. *Id.* at 97. When incarcerated, the individual had literally no access to children, and thus he had no opportunity to engage in an overt act because there were no potential victims. *Id.* But, as pointed out by Justice Fairhurst in her concurring opinion, the absurdity doctrine does not always apply simply because a person is incarcerated. *Id.* Justice Fairhurst persuasively argued that if it can be proved that the alleged SVP's diagnosis and pattern of behavior indicates that the individual did have an adequate opportunity while incarcerated to commit a recent overt act against the type of victim the individual was predisposed to victimize, an overt act might be required. *Id.* For example, Justice Fairhurst noted that a male prisoner serving time for raping an adult male victim could be placed in the general population of the prison where there is opportunity to harm other prisoners. *Id.* at 97 n.2. Under this circumstance, Justice Fairhurst noted, due process would require an overt act before such a prisoner could be committed as an SVP. *Id.* at 97 & n.2.

The bottom line is SVP statutes threaten to deprive individuals of what from time immemorial has been the weightiest of interests—the interest in individual liberty. Yet, the vague and flexible standards of SVP statutes allows, if not encourages, a better-safe-than-sorry approach that tolerates false positives but abhors false negatives. Further, in order to survive due process scrutiny, the SVP statutes are said to target a

narrow class of persons, but the terms utilized are sufficiently vague and the causation elements sufficiently doubtful that there must be some other limiting concept if fact finders are going to be able to distinguish between sexual predators and ordinary recidivists. The overt-act element in SVP statutes like Iowa's serves that function.

**C. Overview of Relevant Iowa Code Provisions Related to SVP Confinement and Special Sentences.**

1. *Relevant provisions of Iowa Code chapter 229A.* Iowa's Sexually Violent Predator Act was enacted in 1998. 1998 Iowa Acts ch. 1171 (codified at Iowa Code chapter 229A (1999)). Similar SVP committal statutes were enacted in about twenty states and federally, beginning with Washington state in 1990. *See* Isaac D. Buck, *The Indefinite Quarantine: A Public Health Review of Chronic Inconsistencies in Sexually Violent Predator Statutes*, 87 St. John's L. Rev. 847, 848 & n.8, 851–54 (2013).

While the "presently confined" language that forms the basis of this appeal is found in a discreet provision of Iowa Code section 229A.4(1) (2016), a review of the SVP chapter provides context. In addition to outlining the structure of the statute, we review statutory language related to "commitment," "custody," and "prison" to help us set the framework for determining the meaning of "presently confined" in Iowa Code section 229A.4(1). *See Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 72 (Iowa 2015) (holding "we read statutes as a whole rather than looking at words and phrases in isolation").

Chapter 229A begins with a lengthy section describing legislative findings supporting the statute. Iowa Code § 229A.1. The legislative findings emphasize the limitations of services provided "in a prison setting" and that the modalities of treatment available in a prison setting

are different from those needed for rehabilitating sexually violent predators. *Id.* While section 1 of the chapter does not prove a legislatively enforceable command, it certainly provides mood music for the interpretation of the SVP statute with a theme emphasizing the limited impact of prison on the rehabilitation of sexually violent predators.

Section 2 of the SVP statute provides several legislatively crafted definitions. *Id.* § 229A.2. Unfortunately there is no statutory definition of the term "presently confined" as utilized in section 4 of the statute. The definition section does provide a definition of a "sexually violent predator" as a person "convicted of or charged with a sexually violent offense and who suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility." *Id.* § 229A.2(12). The definitional section of chapter 229A further provides that if a person is not "confined" at the time of the filing of a petition, the person may be a sexually violent predator "only if the person commits a recent overt act." *Id.* § 229A.2(5).

The definitional section distinguishes between confinement in a secure facility and transitional release. *Id.* § 229A.2(13). The statute provides that "transitional release" means "a conditional release from a secure facility. *Id.* Thus, transitional release and confinement in a secure facility are not the same thing.

Section 3 of the SVP statute is a notice provision. Section 3 requires that "agenc[ies] with jurisdiction" provide notice to the attorney general and a multidisciplinary team established by the department of corrections ninety days prior to the "anticipated discharge" of a person who has been convicted of a sexually violent offense "from total

confinement." *Id.* § 229A.3(1)(*a*). An exception to the ninety-day-notice requirement allows written notice to be given as soon as practicable when a person has been returned "to prison" for no more than ninety days as a result of revocation of parole. *Id.* In this situation, written notice shall be given as soon as practicable following the person's "readmission to prison." *Id.*

Section 3 of the statute is the only provision in the statute to use the term "total confinement." It is not used in Iowa Code section 229A.4(1). Yet, it is clear that the legislature contemplated that anticipated discharge from total confinement was a potential trigger of an SVP proceeding. The contemplated SVP proceeding in the section 3 notice provision was not likely one resulting from the recent-overt-act prong of section 229A.4(2), because the concept of notice of anticipated discharge from total confinement does not have any meaning in the context of a petition based on a "recent overt act."

Section 3 provides that the statutorily required notice must be provided by an agency with jurisdiction. *Id.* § 229A.3(1). An "agency with jurisdiction" is defined as

> an agency which has custody of or released a person serving a sentence or term of confinement or is otherwise in confinement based upon a lawful order or authority, and includes but is not limited to the department of corrections, the department of human services, a judicial district department of correctional services, and the Iowa board of parole.

*Id.* § 229A.2(1).

Once the proper notice has been provided, the multidisciplinary team is directed to assess whether or not the person meets the definition of an SVP and to notify the attorney general of its assessment within thirty days of receiving notice. *Id.* § 229A.3(4). The attorney general is

directed to appoint a prosecutor's review committee and to review the SVP determination of the multidisciplinary team with the committee's assistance. *Id.* § 229A.3(5). We have held that this notice to the attorney general is not an essential step in the filing of an SVP petition, because the notice "is only intended to be a heads-up to an approaching discharge date in case a determination to file a section 229A.4(1) petition appears to be a possibility." *In re Det. of Huss*, 688 N.W.2d 58, 63 (Iowa 2004).

Section 4 of the statute contains the gateway language to a petition for commitment under the SVP statute, the interpretation of which provides the fighting issue in this appeal. Section 4 provides a two-track approach to SVP commitment. The first track is provided by Iowa Code section 229A.4(1). Under Iowa Code section 229A.4(1), the state may file a petition alleging that a person who is "presently confined" is a "sexually violent predator." The language of the "presently confined" track in Iowa Code section 229A.4(1) does not contain a requirement of a recent overt act.

The next subsection of section 4 provides the second track leading to a potential SVP commitment. Iowa Code § 229A.4(2). Under Iowa Code section 229A.4(2), the state may file a petition alleging that a person is a sexually violent predator "if it appears that a person who has committed a recent overt act" meets any one of three statutory criteria. *Id.* § 229A.4(2). The three statutory criteria are where the person (1) "was convicted of a sexually violent offense and has been discharged after the completion of the sentence imposed for the offense," (2) was charged with a sexually violent offense but acquitted by reason of insanity and "has been released from confinement or any supervision," or (3) was charged with a sexually violent crime but was found incompetent

to stand trial, and "has been released from confinement or any supervision." *Id.*

The first statutory criteria under section 229A.4(2) is most relevant here. In order for the recent-overt-act track to be available, a person must have been "discharged after the completion of the sentence imposed for the offense." This provision, when read in conjunction with the notice provision which emphasizes the "anticipated discharge . . . from total confinement," *id.* § 229A.3(1)(*a*), appears to establish a route to commit a person nearing the end of total confinement, and a separate track for a person who has been "discharged after the completion of the sentence for the offense, *id.* § 229A.4(1)–(2)."

Section 5 of the statute outlines the procedures for making a preliminary determination as to whether probable cause exists to believe the person named in the petition is a sexually violent predator. *Id.* § 229A.5(1). Upon a finding of probable cause, the person named in the petition shall be "taken into custody." *Id.* If the person is in custody at the time of the filing of the petition, the court is directed to determine whether the person should be transferred "to an appropriate secure facility" pending the outcome of the proceedings. *Id.* An "appropriate secure facility" is defined as "a state facility that is designed to confine but not necessarily to treat a sexually violent predator." *Id.* § 229A.2(2). The probable cause hearing is to be held within seventy-two hours of the person being taken into custody or transferred to an appropriate secure facility, but the hearing may be waived by the respondent. *Id.* § 229A.5(2).

After the hearing, if the court determines that probable cause does exist to believe the respondent is a sexually violent predator, the court is to have the respondent transferred to an appropriate secure facility for

an SVP evaluation. *Id.* § 229A.5(5). We have said that at a probable cause hearing under chapter 229A, "the district court is only making a preliminary determination that there are sufficient facts in the petition to form a reasonable belief that the individual is an SVP." *In re Det. of Mead*, 790 N.W.2d 104, 111 (Iowa 2010).

Section 5B of the SVP statute deals with "escape from custody." Iowa Code § 229A.5B. For the purposes of the escape provision, a person is in "custody" if he or she "has been placed in a transitional release program or . . . is under release with or without supervision." *Id.* § 229A.5B(1). If a person escapes, the attorney general or the chief law enforcement officer of the political subdivision where the violation occurs may make a public announcement if that person remains "unconfined." *Id.* § 229A.5B(3). This section demonstrates that the legislature was capable of using broad language of "custody" that expressly included "release with or without supervision." Notably, such expansive language is absent from Iowa Code section 229A.4(1).

Section 5C of the SVP statute addressed criminal offenses committed while a person is detained or subject to an order of commitment. *Id.* § 229A.5C. If a person commits a public offense while detained under the SVP chapter, the civil commitment proceedings or treatment process shall be suspended until the criminal proceedings, "including any term of confinement," are completed. *Id.* § 229A.5C(1). Civil commitment proceedings are suspended due to the commitment of a public offense. *Id.* Upon the completion of any term of confinement resulting from the commission of the public offense, a new ninety-day-trial demand automatically begins. *Id.* § 229A.5C(5).

Section 7 of the Act describes the trial of a commitment proceeding under Iowa Code chapter 229A. Among other things, the section

emphasizes that the rules of evidence applicable in criminal proceedings shall apply as well as the right to a trial before a jury with a unanimous verdict beyond a reasonable doubt. *Id.* § 229A.7(4)–(5).

Section 229A.8A through section 229A.9B address issues related to the release of a "committed person." The statute makes clear that a person is still considered committed when in a transitional release program. *Id.* § 229A.8A(1) (stating the department of human services is authorized to provide "supervision of committed persons placed in such a [transitional release] program"); *id.* § 229A.8A(6) (stating the department of human services is responsible for "restrictions on confinement and the movement of committed persons" and for assessing the progress of "committed persons in the [transitional release] program"). Further, a "committed person" who violates a release plan may be taken into custody and returned to a secure facility. *Id.* § 229A.9B(1). In this section, the legislature demonstrated its ability to use the term "committed" rather than "confined" and to define "committed" as including persons in transitional release programs.

2. *Relevant provisions of Iowa Code chapter 903B.* Iowa Code chapter 903B provides for a "special sentence" for sex offenders. A person who commits certain sexual offenses that are class "C" felonies or greater is subject to a lifetime special sentence. *Id.* § 903B.1. A person who commits certain sexual offenses that are class "D" felonies or misdemeanors is subject to a ten-year special sentence in addition to any other punishment provided by law. *Id.* § 903B.2.

Chapter 903B distinguishes between a sentence and a special sentence. The legislature provided in Iowa Code section 903B.1 that "[t]he special sentence imposed under this section shall commence upon *completion* of the sentence imposed under any applicable criminal

sentencing provisions for the underlying criminal offense." *Id.* § 903B.1 (emphasis added). The special sentence is not a continuation of the sentence for the underlying crime.

Those serving a special sentence are placed on the corrections continuum established in chapter 901B for intermediate criminal sanctions. *Id.* The intermediate criminal sanctions under chapter 901B ranges from Level One (self-monitoring, including fines, community service, mediation, victim and offender reconciliation), Level Two (probation and parole), Level Three (quasi-incarceration, including residential treatment facilities and work release facilities), Level Four (short-term incarceration, including jail), and Level Five (long-term incarceration). Iowa Code §§ 901B.1–.2.

**D. Positions of the Parties.** Wygle concedes that he was serving a special sentence under Iowa Code chapter 903B while residing at Curt Forbes Residential Facility. He maintains, however, that this does not qualify as the "present confinement" under Iowa Code section 229A.4(1).

Wygle cites the introductory language of Iowa Code section 229A.1 in support of his position. Wygle notes that Iowa Code section 229A.1 declares that the prognosis for rehabilitating sexually violent predators in a prison setting is poor and that the treatment modalities for sexually violent predators is very different from those available in a prison setting. To Wygle, these passages in the introductory section of Iowa Code chapter 229A suggest that total confinement is required to establish that the offender is presently confined under Iowa Code section 229A.4(1).

Wygle further draws support from language in the notice provision of Iowa Code section 229A.3(1)(*a*). According to Wygle, the use of the terms "total confinement," "returned to prison," and "readmission to prison" in the notice provision of the SVP statute supports his

interpretation that the term "presently confined" in Iowa Code section 229A.4(1) refers to total confinement in prison.

Wygle next analyzes Iowa Code chapter 903B. Upon a violation of the terms of a special sentence, a revocation of release may be ordered and the person imprisoned for not more than two years for the first revocation, and five years for subsequent revocations. Iowa Code § 903B.2. Wygle argues that special sentence in which a person faces the *possibility* of imprisonment cannot be considered the same as imprisonment itself.

Wygle supplements his argument with a citation to *In re Detention of Lewis*, a case decided by the Washington Supreme Court under its SVP statute. 177 P.3d 708 (Wash. 2008) (en banc). In *Lewis*, Lewis was in custody awaiting retrial of a conviction different from the predicate conviction. *Id.* at 709. The state sought to commit him as an SVP under a state statute with a two-track approach similar to Iowa's statute. *Id.* at 710. Lewis alleged that when he was incarcerated on another offense awaiting trial, the state must prove a recent overt act in order to begin commitment proceedings under Washington's SVP statute. *Id.* at 709. The court held that Lewis was "about to be released from total confinement" and, as a result, the state was not required to prove an overt act. *Id.*

Wygle argues that *Lewis* provides the rationale for the two-track SVP gateway. Wygle notes that *Lewis* observed that before a person may be subject to SVP commitment, a recent overt act is generally required in order to satisfy due process concerns. *Id.* at 711. According to Wygle, *Lewis* noted that where offenders are incarcerated and have not been in the community since their original conviction, the state lacks the opportunity to prove dangerousness with an overt act. *Id.* Under these

circumstances, according to *Lewis*, the state is not required to prove the impossible, namely, a recent overt act. *Id.* *Lewis* further observed that the legislature had concluded that "offenders in confinement 'do not have access to potential victims and therefore they will not engage in an overt act.' " *Id.* at 713 (quoting Wash. Rev. Code Ann. § 71.09.010 (West)).

Under the facts and circumstances of the case, the *Lewis* court held that Lewis was "about to be released from total confinement" under the statute. *Id.* As a result, the state was not required to prove an overt act. *Id.* Wygle argues, however, that his situation is different because, unlike Lewis, he has, in fact, been released from total confinement and that a recent overt act is therefore required. He notes that an unpublished opinion of the court of appeals has cited *Lewis* favorably. *See In re Det. of Johnson*, No 10–1462, 2012 WL 1860242, at *5 (Iowa Ct. App. May 23, 2012).

In response, the State recognizes that the term "presently confined" is not defined in Iowa Code chapter 229A. The State contrasts, however, Iowa's use of the phrase "presently confined" in Iowa Code section 229A.4(1) with statutes from other jurisdictions that employ the more specific phrase "total confinement." *See, e.g.*, Fla. Stat. Ann. § 394.912(11) (West, Westlaw through 2018 2d Reg. Sess.); N.H. Rev. Stat. Ann. § 135-E:4 (Westlaw through ch. 7 2018 Reg. Sess.). The State thus reasons that the use of the term "presently confined" rather than the clearer phrase "total confinement" in Iowa Code section 229A.4(1) represents a deliberate legislative choice that should be honored by the courts.

The State recognizes, however, that the term "total confinement" is used in the notice provision of Iowa's SVP statute. Iowa Code § 229A.3(1)(*a*). Yet, the State observes, the definition section of "agency

with jurisdiction"—the party with notice obligations under Iowa Code section 229A.3(1)(*a*)—includes the Iowa Board of Parole. *Id.* § 229A.2(1). If the Iowa Board of Parole has an obligation to provide notice of the release of a potential SVP, the State argues, the statute must include release from parole as a triggering event. Therefore, according to the State, the term "presently confined" in Iowa Code section 229A.4(1) must include release from parole.

The State argues that Iowa caselaw supports its broad construction of the term "presently confined." The State notes that in *Shaffer*, the court declared that the phrase should not be given a "hypertechnical definition" and held that a person who was incarcerated in prison beyond his discharge date was presently confined. 769 N.W.2d at 174–75. The State further notes that in *In re Detention of Willis*, the court held that detention in a county jail is confinement. 691 N.W.2d 726, 729 (Iowa 2005). Thus, according to the State, one need not be in prison to be considered "presently confined" under the statute.

Like Wygle, the State directs our attention to what it regards as persuasive out-of-state authority as well. In *Jackson v. California Department of Mental Health*, the United States Court of Appeals for the Ninth Circuit held that under California's SVP law, the statutory requirement that a person be in custody when a petition is filed includes situations in which a person is on parole. 318 F App'x 582, 586–87 (9th Cir. 2009). The State also cites Kansas authority, which it asserts stands for the proposition that an SVP action may be brought at any time when the respondent is serving any part of a sentence, "including a period of postrelease supervision." *In re Care & Treatment of Sporn*, 215 P.3d 615, 618 (Kan. 2009).

Finally, the State claims that public policy supports its position. The State argues that a person on parole, although less confined than a person in prison, still has limited opportunities to commit recent overt acts compared to a person not under state supervision. As a result, the State asserts we should not require a recent overt act when a person is on parole for a sexually violent offense.

**E. Relevant Iowa Caselaw.** In *Stamus,* a federal district court struck down the civil commitment statute in Iowa Code chapter 229 on due process grounds because the statute did not require a showing of dangerousness through a recent overt act. 414 F. Supp. at 451. Subsequent to *Stamus,* we have repeatedly held in the civil commitment context that a recent overt act, attempt, or threat was required to show that the person is likely, if allowed to remain at liberty, to inflict physical injury on himself or herself or on others. In *In re Mohr*, we declared that because predicting dangerousness was "a difficult if not impossible task," a finding of mental illness alone could not be sufficient to justify an indefinite detention, but must also include a showing of a recent overt act, attempt, or threat. 383 N.W.2d 539, 542 (Iowa 1986). In *In re Foster,* we emphasized that evidence to support a judgment of dangerousness supporting a civil commitment must come in the form of a "recent overt act, attempt or threat." 426 N.W.2d 374, 377 (Iowa 1988) (quoting *Stamus,* 414 F. Supp. at 451). In *State v. Huss,* the court warned that expert speculation about dangerousness grounded in statistical probabilities cannot justify a commitment absent proof of a recent overt act. 666 N.W.2d 152, 162–63 (Iowa 2003).

Our first case considering the meaning of the term "presently confined" in Iowa Code section 229A.4(1) is *Gonzales,* 658 N.W.2d 102. In *Gonzales,* the respondent had been convicted of a sexually violent

offense, had discharged the sentence for that crime, but had subsequently been sentenced to prison for operating a motor vehicle without the owner's consent. *Id.* at 102. The question presented in *Gonzales* was whether the term "presently confined" in Iowa Code section 229A.4(1) should be read to mean presently confined *for a sexually violent offense* or, in the alternative, should the statute be read to mean any time a person is presently confined, even for a nonsexual crime like operating a motor vehicle without the owner's consent. *Id.* at 104–05.

The *Gonzales* court held that the term "presently confined" meant presently confined for a sexually violent offense. *Id.* at 106. The *Gonzales* court recognized that the legislature did not expressly qualify the term "presently confined" in Iowa Code chapter 229A.4(1). *Id.* at 104–05. Yet, the *Gonzales* court reasoned that in order to impose civil commitment consistent with the constitutional commands of due process, there generally must be a recent overt act. *Id.* at 105. When a person is imprisoned for a sexually violent offense, the recent overt act could be deemed to be the underlying offense. *Id.* But to allow a nonsexual act to be deemed to be a recent overt act, according to the *Gonzales* court, would "raise serious constitutional issues." *Id.* The court favorably cited *Stamus* as recognizing "the constitutional importance of showing a recent overt act" in chapter 229 civil commitments. *Gonzales*, 658 N.W.2d at 105. The *Gonzales* court also favorably cited the discussion in *Mohr*, which noted that our rules for hospitalization of mentally ill persons require a physician's diagnosis including "a detailed statement of facts, symptoms and *overt acts* observed or described to him or her, which led to the diagnosis." *Gonzales*, 658 N.W.2d at 105 (quoting *Mohr*, 383 N.W.2d at 542). The *Gonzales* court further favorably cited a passage in *Lynch*, which stated,

> A mere expectancy that danger-productive behavior might be engaged in does not rise to the level of legal significance when the consequence of such an evaluation is involuntary confinement. To confine a citizen against his will because he is likely to be dangerous in the future, it must be shown that he has actually been dangerous in the recent past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or to another.

*Gonzales,* 658 N.W.2d at 105 (quoting *Lynch,* 386 F. Supp. at 391). We further cited a leading Iowa academic, Professor Randall Bezanson, for the proposition that

> [t]he requirement that a prediction of dangerousness . . . must be based on prior overt manifestations of danger is necessary both in order to protect the reliability of the prediction under the clear and convincing standard of proof . . . and in order to satisfy constitutional standards.

*Id.* at 106 (quoting Randall P. Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa: The 1975 Legislation,* 61 Iowa L. Rev. 261, 295 n.161 (1975)).

Because the respondent was not "presently confined" for a sexually violent offense and the state failed to even allege a recent overt act, the *Gonzales* court reversed the commitment order of the district court and remanded the case with instructions to dismiss the action. *Id.* There can be little question that the meaning of the term "presently confined" in the statute was driven in large part by the generally applicable due process requirement that before a person is civilly committed, there must be a showing of dangerousness based on recent overt acts.

Two years later, we returned to the meaning of the term "presently confined" in *Willis,* 691 N.W.2d 726. In that case, Willis had been convicted by a jury of a sexually violent offense, but not yet been sentenced. *Id.* at 727–28. He resided in the custody of the Henry County Sheriff. *Id.* at 728. The state filed an SVP petition asserting Willis was presently confined for a sexual offense under Iowa Code

section 229A.4(1) even though he had not been sentenced for the underlying offense. *Id.*

As in *Gonzales*, the *Willis* court analyzed the issue presented by looking at the larger due process constitutional context of the SVP statute. *Willis*, 691 N.W.2d at 729–30. The court observed that the absence of a recent act when in secure confinement "does not paint the same picture" as the same in a normal life situation. *Id.* at 729. The court reasoned that the legislature could conclude that for persons in secure confinement the underlying sexually violent offense could be considered a recent overt act consistent with due process. *Id.* Further, the filing of an SVP commitment petition must necessarily be delayed until near the end of confinement for the underlying sexual offense. *Id.* at 730.

Our next SVP case involving whether a person is "presently confined" under Iowa Code section 229A.4(1) is *Shaffer*, 769 N.W.2d 169. In this case, Shaffer was imprisoned at the Anamosa State Penitentiary for a sexually violent offense when the state filed its SVP petition. *Id.* at 171. Shaffer argued, however, that the state miscalculated his release date for the sexually violent offense and that, at the time the state filed its SVP petition, his sentence had already expired. *Id.* at 171–72. The interesting question in *Shaffer* was whether a person could be considered presently confined when being held beyond his release date. *Id.* at 173.

The *Shaffer* court answered the question in the affirmative. *Id.* at 175. The court reasoned that in *Willis* the fact that the later judicial proceedings could have shown the present confinement of Willis to be unlawful did not matter. *Shaffer*, 769 N.W.2d at 174. The court observed that although subsequent caselaw demonstrated that the state had miscalculated Shaffer's release date, the miscalculation, which was

made in good faith, did not alter the fundamental fact that Shaffer, at the time the SVP petition was filed, was presently confined. *Id.* at 174. The implication of *Shaffer* was that SVP proceedings were designed to provide a seamless transition for dangerous offenders from being presently confined for sexually violent offenses to civil confinement and treatment under the SVP statute. *See id.* at 175. As a result, the physical circumstances of whether a person was "presently confined" for a sexually violent offense was key, and the result was not affected by a miscalculation of a release date. *See id.*

Finally, in *Stenzel,* we considered a case in which the respondent was convicted of both a sexually violent offense and the nonsexual offenses of burglary and arson. 827 N.W.2d at 693. The sentence for the sexually violent offense and the sentence for the nonsexual offenses were to be served consecutively. *Id.* Stenzel claimed that he first served his sentence for the sexually violent offense. *Id.* Stenzel argued that at the time the state filed its SVP petition, his sentence for the sexually violent offense had been discharged and that he was then presently confined as a result of the nonsexual offenses. *Id.*

The *Stenzel* court rejected the respondent's arguments. *Id.* at 701. The *Stenzel* court emphasized that in a situation involving concurrent sentences for sexually violent and nonsexually violent offenses, it was illogical to try to determine which sentence was first served. *Id.* at 700–01. Further, according to the *Stenzel* court, it made little sense to evaluate a person presently committed years before anticipated release. *Id.* at 700. The *Stenzel* court further noted that under Iowa Code section 229A.3(1), the attorney general and the multidisciplinary team established in chapter 229A was to receive notice of the anticipated discharge of a person convicted of a sexually violent offense. *Id.* at 699.

The *Stenzel* court cited favorably an out-of-state case, *Fair*, 219 P.3d 89 (majority opinion). *Stenzel*, 827 N.W.2d at 701. In *Fair*, the Washington Supreme Court noted that when a person is in continuous confinement for sexual and nonsexual offenses, it would be absurd to require proof of an overt act because of the lack of opportunity to commit an overt act in the community. 219 P.3d at 92.

Obviously, the above cases do not directly address the question of whether a person is presently confined when residing at a halfway house pursuant to a special sentence under Iowa Code chapter 903B. The cases do stand for the general propositions, however, that we construe the phrase "presently confined" in context with the larger statutory framework and seek to provide it with a practical gloss that recognizes both the underlying purposes of the statute and the due process dimension underlying the ordinary requirement of a recent overt act to support involuntary civil commitment.

**F. Cases from Other Jurisdictions.** Cases from other jurisdictions have addressed the question of what showing must be made before a person may be civilly committed because of dangerousness.

As noted previously, many states have enacted SVP statutes. Because SVP statutes in other jurisdictions often use different nomenclature than utilized by the Iowa legislature, however, cases from other state appellate courts have limited applicability in the interpretation of Iowa Code chapter 229A. Yet, the reasoning of out-of-state cases may inform our analysis of the Iowa statute.

In *Lewis,* the Washington Supreme Court considered the meaning of the term "total confinement" in its SVP statute. 177 P.3d at 711. According to the *Lewis* court, total confinement meant "confinement inside the physical boundaries of a facility or institution operated or

utilized under contract by the state or any other unit of government for twenty-four hours a day." *Id.* at 713 (quoting *Albrecht*, 51 P.3d at 77). In *Lewis,* however, the statute expressly referred to the requirement of "*total* confinement." Under the Iowa statute, while the term "total confinement" appears in the notice provision of Iowa Code section 229A.3(1)(*a*), the term utilized by the legislature in the gateway provision authorizing the filing of SVP petitions, is simply "presently confined." Iowa Code § 229A.4(1).

A second out-of-state case dealing with somewhat similar issues is *Sporn*, 215 P.3d 615. In that case, the respondent was convicted of a sexually violent offense. *Id.* at 616. As he approached release on parole but while still in prison, the state initiated an SVP action against him, but a jury found that he was not an SVP. *Id.* After he prevailed in the SVP action and was released on parole, Sporn violated the terms of parole by viewing pornography and sexually explicit material on his computer. *Id.* Upon his return to prison on the parole violation, the state brought a second SVP case against him. *Id.*

Unlike the Iowa statute, the Kansas statute makes it clear that a person returned to prison for violation of parole in a case involving an underlying sexually violent offense may be subject to an SVP commitment proceeding. *Id.* at 617–18. The state argued that under the statute, the relevant trigger was impending release from prison. *Id.* at 618. The Kansas court, however, held the prior SVP action was res judicata and the state was barred from bringing a second action. *Id.* at 620. In passing, however, the Kansas Supreme Court cited other Kansas caselaw for the proposition that an SVP petition could be filed during the "complete sentence" which "includes the prison sentence, the maximum good time credit allowance, *and a period of postrelease supervision.*" *Id.*

at 618 (emphasis added) (quoting *In re Care & Treatment of Johnson*, 85 P.3d 1252, 1257 (Kan. Ct. App. 2004)). The Kansas Supreme Court, however, did not necessarily endorse the notion that an SVP petition could be filed when a person is on parole, but instead held that under the statute, there could only be one procedure per complete sentence. *Id.*

There is one federal case that the parties have cited considering SVP interpretive issues. In *Jackson*, the court construed the term "in custody" in California's SVP statute to include situations when a person is on parole. 318 F. App'x at 586. The language of the California statute, however, is materially different than Iowa Code chapter 229A.

**G. Discussion.** For purposes of determining whether residency at the Curt Forbes Residential Facility pursuant to Iowa Code chapter 903B is "presently confined" under Iowa Code section 299A.4(1), there are a number of plausible linguistic options. The term "presently confined" could include situations where the respondent is out in the community during the day but not free to come and go as he or she pleases and is required to physically report and reside in a specific location. Or, the term plausibly could be interpreted in a narrower fashion to include only something more akin to total confinement. Because the term "presently confined" is ambiguous, we may turn to tools of statutory construction to assist us in resolving the question. *See State v. McCullah*, 787 N.W.2d 90, 94 (Iowa 2010).

As in *Gonzales*, we approach the question of statutory interpretation in the context of the constitutional limitations of civil commitment. *See* 658 N.W.2d at 105. We have repeatedly stated that as a general matter, a recent overt act is a requirement if civil commitment is to satisfy the demands of due process. *See id.* An exception has been

carved out for persons incarcerated for sexual offenses, but that exception is based upon the absurdity or impossibility of committing *recent* overt acts when incarcerated. *See Martin,* 165 Cal. Rptr. at 780 (finding due process does not require "the absurd be done" when a person is incarcerated—namely, requiring the state to show a recent overt act which "cannot, as a practical matter, be committed during confinement"); *Young,* 857 P.2d at 1008 (stating requiring a recent overt act for incarcerated individuals would create "an impossible condition"). But, if the requirement of showing a recent overt act is not absurd or impossible, then the overt-act requirement is applicable. *Albrecht,* 51 P.3d at 78 (holding the state was required to show proof of a recent overt act for individual who was recently released from incarceration into the community).

Even in conditions of total confinement, the absurdity or impossibility exception to the recent-overt-act requirement may have limits. As Justice Fairhurst demonstrated in her concurrence in *Fair,* the absurdity or impossibility exception to the recent-overt-act requirement imposed by due process might not apply in a prison setting where the prisoner is placed in the general population in a prison of adult males and the class of victims the offender preys upon is adult males. 219 P.3d at 97 & n.2 (Fairhurst, J., concurring). Under such conditions, sexual assault may not be impossible or absurd.

In any event, under conditions of less than total confinement, the rationale for the absurdity or impossibility exception is severely undermined, and as in *Gonzales,* any interpretation that the recent-overt-act requirement is waived in situations involving less than total confinement would "raise serious constitutional issues." 658 N.W.2d at 105. If fairly possible, we will construe a statute to avoid doubt as to

constitutionality. *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 74 (Iowa 2010); *Thompson v. Joint Drainage Dist. No. 3-11*, 259 Iowa 462, 468, 143 N.W.2d 326, 330 (1966).

Our construction of the statute is thus driven by the need to comply with the demands of due process identified above. We begin our analysis by looking at the statute in its broader context. *See Geltz*, 840 N.W.2d at 275. The preamble to the statute emphasizes that because the prognosis for rehabilitating sexually violent predators "in a prison setting is poor" and the treatment modalities required are very different from those in a prison setting, civil commitment is necessary. Iowa Code § 229A.1. Although only indirectly persuasive on the precise question at hand, the language of the preamble at least suggests the legislature considered the dichotomy between prison settings and other settings to be an important impetus to the enactment of the SVP provisions of Iowa Code chapter 229A.

The notice provision of Iowa Code section 229A.3 tends to reinforce the centrality of the distinction between prison and other settings. When a person who may be considered to be an SVP is "confined," the agency with jurisdiction over the person must provide notice to the attorney general and a multidisciplinary team established by the department of corrections of "the anticipated discharge date" of the person convicted of a sexually violent offense "from total confinement." *Id.* § 229A.3(1). The use of the terms "confined" and "total confinement" in the same section are not precisely parallel. When read in tandem with the general language about "prison" in the preamble, however, the language in section 229A.3(1) and .3(1)(*a*) indicates that when persons who are confined in prison are released from total confinement, including, for

example, placed on parole or work release, the ninety-day-notice mechanism is triggered.

Analysis of the language of various sections of Iowa Code chapter 229A tends to reinforce an interpretation that presently confined means total confinement. Plainly, the legislature knew how to utilize broad phrases that expressly included custody other than total confinement in three places of the statute. Iowa Code section 229A.5B expressly provides that the term "custody" as used in the section includes persons "in transitional release program" or "under release with or without supervision." Iowa Code section 229A.8A(6) states that the department of human services is authorized to place "restrictions on confinement and the movement of committed persons" and to assess the progress of "committed persons in the [transitional release] program." Plainly, committed persons can include persons in transitional release. Finally, Iowa Code section 229A.9B provides that a "committed person" who violates "a release plan" may be returned to a "secure facility." Obviously, if a committed person may violate a release plan, a person on a release plan may be a committed person. The legislature's use of broad language in these three provisions of the statute, in contrast to the unadorned language in Iowa Code section 229A.4(1), suggests that the term "confinement" was not to be broadly construed as suggested by the State. *See Miller v. Marshall County*, 641 N.W.2d 742, 749 (Iowa 2002) ("We assume the legislature intends different meanings when it uses different terms in different portions of a statute.").

Further, the rationale for not requiring a recent overt act as explained in the caselaw tends to support the notion that the critical time for triggering the SVP statute is release from total confinement. The cases emphasize that when in prison, there is much less opportunity for

a person previously convicted of a sexual offense from committing a recent overt act. *Willis*, 691 N.W.2d at 729; *Lewis*, 177 P.3d at 711. Because of the intense supervision in prison and the resulting comparative lack of opportunity to commit a recent overt act, our cases hold that the original conviction of a sexual offense can be deemed to be the equivalent of a recent overt act for due process purposes. *Stenzel*, 827 N.W.2d at 698. But while "[t]he absence of sexually predatory acts in a setting of secure confinement does not paint the same picture as the absence of such acts in a normal life situation," the observation has less force when an offender is not totally confined but has much lessened restraint on his or her personal freedom. *Willis*, 691 N.W.2d at 729.

Yet, we are troubled by one aspect of the interpretation of presently confined to mean total confinement. Assume, for instance, that a person is not totally confined but is on parole for an underlying sexually violent crime. That person then commits a recent overt act. Such a person could not be committed under Iowa Code section 229A.4(1). But, the person also could not be committed under the recent-overt-act track of Iowa Code section 229A.4(2). Under Iowa Code section 229A.4(2), a person may be subject to commitment if there is a recent overt act and if the person "has been discharged after the completion of the sentence imposed for the offense." Thus, a person on parole for a sexually violent crime arguably has not completed the sentence imposed for the offense and cannot be committed under Iowa Code section 229A.4(2). One may question whether the legislature intended that a person convicted of a sexually violent offense but on parole could not be committed as an SVP under any circumstance.

Yet, the need to conform our construction of the statute to the demands of due process, along with the other features of the statute

cited above, convinces us that the recent-overt-act requirement cannot be waived unless it would be impossible or absurd to require it. As a result, we construe Iowa Code section 229A.4(1) to require total confinement before the State may proceed on an SVP commitment without a recent overt act.

We also think that Wygle is entitled to prevail for another reason. Wygle is not a resident of Curt Forbes Residential Facility on parole as a result of his sentence for the underlying sexual offense. Instead, he was returned to prison as a result of his special sentence under Iowa Code section 903B.1. Under Iowa Code section 903B.1, the special sentence commences after the "completion of the sentence imposed under any applicable criminal sentencing provisions for the underlying criminal offense." The legislature has thus made it clear that a sentence and a special sentence are simply not the same thing. Under Iowa Code section 229A.4(1), a person must be presently confined for a sexually violent crime. Under our interpretation, a special sentence cannot be considered part of the sentence for the original crime under the statute. Further, Iowa Code section 229A.4(2) requires a recent overt act when someone "has been discharged after the completion of the sentence imposed for the offense." The term "sentence" in this provision also does not include the special sentence under Iowa Code section 903B.1.

This interpretation is consistent with the sequence of legislative actions. The SVP statute was originally enacted in 1998 at a time when there was no special-sentence provision. Not surprisingly, there is nothing in the SVP statute that accommodates the later enacted statute. When the legislature enacted Iowa Code 903B in 2003, the legislature made no attempt to integrate the terms of Iowa Code chapter 903B with the SVP statute. The inference may be made that the legislature did not

attempt to integrate the statutes because they were stand-alone provisions.

In addition to making sense under the language of the statutes, this interpretation also avoids serious constitutional problems. Under Iowa Code section 903B.2, a special sentence for certain sexually violent crimes can last a lifetime. To suggest that a person who has been released into the community but is serving a special sentence after his discharge from his sentence for the underlying offense could be subject to an SVP proceeding many years or even decades later without a recent overt act merely because of the existence of a special sentence would plainly stretch the statute beyond the boundaries of due process. The caselaw clearly emphasizes that as a general proposition, due process requires a recent overt act before a person can be civilly committed. *Gonzales*, 658 N.W.2d at 105.

For all the above reasons, we conclude that a person who has completely discharged the sentence for the underlying sexual crime and is serving a special sentence under Iowa Code chapter 903B is not "presently confined" for the purposes of Iowa Code section 229A.4(1).

### IV. Conclusion.

Based on our review, the judgment of the district court is reversed and the case remanded to the district court for dismissal of the SVP action.

**REVERSED AND REMANDED WITH DIRECTIONS.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who dissent.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. In my view, an individual convicted of a sexually violent offense who is required as part of his sentence to stay at a facility under the jurisdiction of the district department of correctional services is "presently confined" within the meaning of Iowa Code section 229A.4. *See* Iowa Code § 229A.4 (2016). Therefore, the State did not have to prove a recent overt act to bring a petition seeking Nicholas Wygle's commitment as a sexually violent predator.

I begin with a dictionary definition. The first definition of "confine" is "to hold within a location." *Confine, Merriam-Webster's Collegiate Dictionary* (11th ed. 2014). Likewise, our false imprisonment statute punishes wrongful confinement and states that "[a] person is confined when the person's freedom to move about is substantially restricted by force, threat, or deception." Iowa Code § 710.7. In this sense, Wygle was "presently confined."

Along the same lines, a person at a facility like the Curt Forbes Residential Facility is generally considered to be "in custody." *See also id.* § 719.4 (indicating that the offenses under "[e]scape or absence from custody" apply to prisons, jails, and community-based correctional facilities); *State v. Halverson*, 857 N.W.2d 632, 634 (Iowa 2015) (stating that the defendant "was in the *custody* of the residential facility— commonly referred to as a halfway house . . . ." (emphasis added)).

I agree that the statute is inartfully drafted and that any interpretation, including the majority's, is going to result in loose ends. But "[w]e have rejected previous attempts to apply a hypertechnical definition of the phrase 'presently confined.' " *In re Det. of Shaffer*, 769 N.W.2d 169, 174 (Iowa 2009). In *Shaffer*, we held that an individual was

presently confined because he was, in fact, confined even though he was being held unlawfully past his discharge date. *Id.* at 175. In *In re Detention of Willis*, we held that an individual was presently confined because he was in jail after having been convicted of a sexually violent offense even though he had not been sentenced. *See* 691 N.W.2d 726, 729 (Iowa 2005). In *In re Detention of Gonzales*, we held that presently confined means "confined for a sexually violent offense," although the statute contains no such requirement. *See* 658 N.W.2d 102, 104–06 (Iowa 2003). In *In re Detention of Stenzel*, we clarified that so long as someone is "continuously confined on a term of imprisonment that *includes* a sexually violent offense," the person is presently confined regardless of the order in which the sentences are served. *See* 827 N.W.2d 690, 697–701 (Iowa 2013).

Using the practical interpretation of "presently confined" that we have heretofore followed, I would hold that someone who is convicted of a sexually violent offense and has been continuously in some type of custody thereafter, such as Wygle, is presently confined within the meaning of Iowa Code section 229A.4(1). This is true whether the custodial arrangement is part of the initial sentence or the special sentence. Once the person has been released from confinement, e.g., he or she has been paroled into the general community, then the State must allege and prove a recent overt act under section 229A.4(2)(*a*).

This interpretation allows the statute to operate in the binary manner that was clearly intended by the legislature. That is, where there has been a continuous confinement that originated when the person committed a sexually violent offense, the person is "presently confined" under Iowa Code section 229A.4(1). Once the confinement has been broken and the person is generally unrestrained to commit other sexual

offenses, the person "has been discharged after the completion of the sentence imposed," and the state must prove a recent overt act under section 229A.4(2)(*a*).

I recognize this interpretation does not follow the typical view of what it means to be "discharged after the completion of the sentence." Normally we do not accord that status to someone who has been merely released on parole. (The majority's interpretation of Iowa Code section 229A.4 is vulnerable to the same criticism.) However, this interpretation dovetails with our prior caselaw. Furthermore, unlike the majority's interpretation, it treats the special sentence as a form of parole, which is exactly what the legislature has said it is. *See* Iowa Code §§ 903B.1, .2. At the same time, it also avoids potential constitutional concerns.

In my view, the majority somewhat overstates those concerns. In the majority's view, once a person who committed a sexually violent offense has been moved from total confinement to a halfway house where it might be at least *possible* to commit a new sexually violent overt act, the state has to prove such an act. It can no longer rely on the earlier offense.

No prior case that I'm aware of has adopted this rule. Rather, we have said,

> The significance of a recent overt act in predicting future conduct is not the act but the inference against a particular propensity that arises from the absence of an overt act. The absence of sexually predatory acts in a setting of secure confinement does not paint the same picture as the absence of such acts in a normal life situation.

*Willis*, 691 N.W.2d at 729; *see also Stenzel*, 827 N.W.2d at 699–700 (quoting this language). In other words, under our precedent, the key question is not whether it might be theoretically possible for the respondent to have committed a new overt act. That's always possible,

even in a maximum security prison. Instead, the critical inquiry is whether the respondent has been moved to a setting that allows one to draw the inference the respondent is not dangerous based upon the absence of sexually violent acts. I would conclude that threshold has not been met.

The majority relies heavily on jurisprudence from Washington. But the Washington Supreme Court held it was constitutional to commit an individual as a sexually violent predator who had been released from prison for the past ten years and merely made *threats* that he would commit new sexually violent offenses. *In re Det. of Danforth*, 264 P.3d 783, 786, 792 (Wash. 2011) (en banc). Due process could be satisfied by threats that "have created a reasonable apprehension of [sexually violent] harm in the mind of an objective person who knows of the history and mental condition of the person." *Id.* at 792. If the "recent overt act" requirement can be met by a mere threat, it logically follows that the "presently confined" requirement can be met by halfway house confinement. In both instances, there is no hard and fast constitutional rule that recent sexually violent conduct must be proved unless it would have been totally impossible for the respondent to have engaged in such conduct.

I would therefore affirm the district court's denial of Wygle's motion to dismiss.

Waterman and Zager, JJ., join this dissent.